**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

| | |
|---|---|
| HEATHER BATAYIAS, | |
| Plaintiff, | CIVIL ACTION NO. 4:19-cv-00015 |
| v. | |
| THE MECHANICAL SHOP and LOCAL UNION 188 UA, | |
| Defendants. | |

**O R D E R**

This action arises out of the sexual harassment and wrongful termination allegedly suffered by Plaintiff Heather Batayias[1] during her employment with Defendant The Mechanical Shop ("TMS"). (Doc. 1.) Plaintiff sued Defendant TMS as well as Defendant Local Union 188 UA ("Local 188") (collectively "Defendants") for alleged violations of Title VII of the Civil Rights Act of 1964 ("Title VII"). (Id. at pp. 5–6.) Specifically, she asserts that Defendants created a hostile work environment through sexual harassment, discriminated against her because of her gender, and retaliated against her in violation of the statute.[2] (Id.) Plaintiff also seeks attorney's

---

[1] The Court notes that it appears from the pleadings and exhibits that Plaintiff's last name is actually "Batayias" but that it was spelled incorrectly in the Complaint's caption as "Batyias." (See, e.g., doc. 26-1, p. 2.) Accordingly, the Court **DIRECTS** the Clerk of Court to amend the docket of this case to reflect that Plaintiff's last name is "Batayias."

[2] While the introduction section of Plaintiff's Complaint alleges a violation of Title VII due to "discrimination based on Plaintiff's gender, sexual harassment and retaliation," (doc. 1, p. 1), neither of the two substantive counts of the Complaint specifically assert a claim based on disparate treatment or sexual harassment, (see id. at pp. 5–6). Count I, however, which is entitled "Violations of Plaintiff's Civil Rights Under Title VII Gender Discrimination," purports to "re-allege[] and reiterate[]" all previous allegations in the Complaint, which would arguably incorporate the disparate treatment and sexual harassment allegations. (Id. at pp. 3–5.) While this type of "shotgun" pleading by a plaintiff is strongly disfavored by the Court, for the sake of thoroughness and judicial efficiency, the Court liberally interprets Count I as

fees and punitive damages.  (Id. at p. 6.)  Presently before the Court is TMS's Motion for Summary Judgment, (doc. 22), and Local 188's Motion for Summary Judgment, (doc. 25).  Plaintiff filed a Response to these Motions, (doc. 38), and Local 188 thereafter filed a Reply, (doc. 40).  Given the similarity of the issues and claims concerning the Defendants, the Court addresses the Motions for Summary Judgment concurrently.  The Court finds that Plaintiff has presented sufficient evidence for her Title VII sexual harassment hostile work environment claim against TMS to survive summary judgment.  In addition, her claim for attorney's fees survives to the extent it is based on her Title VII sexual harassment hostile work environment claim.  Accordingly, the Court **DENIES** summary judgment on these claims.  (Docs. 22.)  However, the Court **GRANTS** TMS's Motion for Summary Judgment on Plaintiff's remaining claims, (doc. 22), and **GRANTS** Local 188's Motion for Summary Judgment in its entirety, (doc. 25), as Plaintiff has not provided sufficient evidence to create a jury issue on these claims.

## BACKGROUND

### I.    Plaintiff's Professional Background

Plaintiff, who is a female, has worked as a welder for more than ten years.  (Doc. 26-1, pp. 3, 31.)  Plaintiff was initially a member of Local 188, (id. at p. 5), the recognized collective bargaining representative for pipe fitters and welders in several counties in south Georgia, (see generally doc. 26-6).  However, in 2013, Plaintiff ended her membership with Local 188 and transferred to Local 228, which is based in California.  (Doc. 26-1, pp. 6–9; doc. 26-8, p. 1.)  Plaintiff eventually returned to Local 188's jurisdiction, but she did not transfer her membership

---

asserting both a Title VII disparate treatment claim and a sexual harassment hostile work environment claim in addition to a gender discrimination claim.  See, e.g., Dist. 65 Ret. Tr. for Members of Bureau of Wholesale Sales Representatives v. Prudential Sec., Inc., 925 F. Supp. 1551, 1563 (N.D. Ga. 1996) ("While the allegations in the complaint may have been pleaded more clearly, the Court interprets complaints liberally in order to preserve claims where a set of facts may be proven to show that relief is warranted.").

back to Local 188. (Doc. 26-1, p. 14.) Because she did not transfer her membership back, Local 188 considered her to be a "traveler" (as opposed to a "local") worker while she was back within its jurisdiction. (Doc. 26-2, p. 10.)

## II.    Plaintiff's Problems with Coworkers at TMS

After returning to Local 188's jurisdiction, Plaintiff began working for TMS sometime in mid-April 2017. (See doc. 26-1, pp. 14, 28.) TMS specializes in industrial pipefitting, (doc. 26-3, p. 9), and hired Plaintiff to work as a welder on a project, (doc. 26-1, pp. 14–15). Plaintiff initially worked in a group led by Jimmy Ulmer, who was a foreman on the worksite. (Id. at p. 16.) In addition to Ulmer, Plaintiff also reported to Brian Gracen, the general foreman, and Marlon Garrison, the superintendent. (Id.) At the end of her first day on the job, she checked her cellphone and found that one of her coworkers, Brian Vescelus, had sent her several messages through Facebook's messenger function. (Id. at p. 17.) Plaintiff knew Vescelus before she started working for TMS, and she had been friends with his wife several years earlier, but she had never previously received or exchanged messages with him. (Id.) The messages from Vescelus included comments about Plaintiff's appearance and invitations to get together outside of work.[3] (Id.) In his final

---

[3] Plaintiff does not provide the original copy of these Facebook messages, and the only evidence of their contents is provided by Plaintiff's deposition testimony. (Doc. 26-1, p. 17.) Under the Federal Rules of Evidence, "[a]n original writing . . . is required in order to prove its content unless these rules or a federal statute provides otherwise." Fed. R. Evid. 1002. However, even assuming the rule would apply here, neither Defendant has argued that Plaintiff's deposition testimony about the messages should be barred pursuant to it and, thus, any such argument has been waived. See Ridgway v. Ford Dealer Comput. Servs., Inc., 114 F.3d 94, 98 (6th Cir. 1997) (defendant waived valid best evidence rule argument by not objecting to the evidence when it was introduced). Furthermore, evidence in the record indicates that the Facebook messages have been lost. (Doc. 26-1, p. 18.) An exception to the best evidence rule provides that the original is not required if "all the originals are lost or destroyed, and not by the proponent acting in bad faith." Fed. R. Evid. 1004(a). Thus, even if Defendants had properly raised a best evidence objection, the deposition testimony concerning the Facebook messages would potentially still be admissible under this exception. Moreover, "even unauthenticated or otherwise inadmissible evidence is properly considered on summary judgment so long as it can be reduced to admissible form [at trial]." Glovis Alabama, LLC v. Richway Transportation Servs. Inc., No. CV 18-00521-KD-N, 2020 WL 3630739, at *9 (S.D. Ala. July 3, 2020) (citing Rowell v. BellSouth Corp., 433 F.3d 794, 800 (11th Cir. 2005)). For all these reasons, the

message that day, Vescelus stated that he was "hornier than a two-pecker billy goat" because he no longer had sexual intercourse with his wife and asked Plaintiff to have sex with him.  (Id.) Plaintiff testified in her deposition that she was offended by the messages.  (Id. at pp. 17–18.)

Either that day or the next, Plaintiff told Ulmer and James Burrows, who was another foreman on the worksite, about the Facebook messages.  (Id. at p. 19.)  She asked that they keep Vescelus away from her.  (Id. at p. 20.)  For the rest of that week, Plaintiff and Vescelus worked in different areas (as they already had been on the first day of work), and Plaintiff experienced no problems with him.  (Id.)  Sometime during the next week, Gracen and Garrison approached Plaintiff and told her that they needed her to work in a different area in order to maintain their schedule.  (Id.)  Plaintiff said to them, "[P]lease don't put me over there" in closer contact with Vescelus, explaining to them that "he has not been able to control himself . . . and it will not be good" if they did not continue to be separated.  (Id. at p. 19.)  She then showed Gracen and Garrison the Facebook messages, which, according to Plaintiff, they laughed at.  (Id. at pp. 19, 20.)  After Gracen repeatedly "begged" her to "please" go weld in Vescelus's area, she agreed and commented, "If I go over there and [Vescelus] lays a hand on me, there's going to be big, big consequences."  (Id. at p. 20.)  Gracen told Plaintiff that he would keep an eye on the situation. (Id. at p. 22.)

When Plaintiff arrived at the new work area, Vescelus began mouthing "I love you" at her. (Id. at p. 23.)  Plaintiff says this occurred multiple times.  (Id. at p. 24.)  A few days after this, Vescelus touched Plaintiff's buttocks while she was welding.  (Id. at p. 26.)  Plaintiff reported this to Mike Barthelmess, who was also a foreman.  (Id. at p. 24.)  She says Barthelmess did nothing to address her concerns.  (Id.)  Later that same day, Plaintiff and Barthelmess got into an argument

Court will consider Plaintiff's deposition testimony concerning the Facebook messages' content for the purposes of evaluating the present motion.

about a piece of equipment.  (Id. at p. 25.)  Barthelmess yelled at Plaintiff and told her to leave the

worksite.  (Id.)  When she refused to do so, Barthelmess left.  (Id.)  Just after that, Randy Jones,

one of the owners of TMS, approached Plaintiff.  (Id.; doc. 26-3, pp. 16–17, 32.)  Plaintiff told

Jones about what had happened with Barthelmess and Vescelus, and Jones said that he would "fix

it."  (Doc. 26-1, p. 25.)

    Right after her conversation with Jones, Plaintiff called Local 188 and told Barry Zeigler,

the business manager there, that she wished to file a grievance against Barthelmess and Vescelus.

(Id. at pp. 31–32.)  According to Plaintiff, Zeigler refused to file a grievance for her.  (Id.)

However, Plaintiff still had the ability to file a grievance at either Local 188 or with the

international union, and Zeigler could not prevent her from doing this.  (Doc. 26-2, pp. 7–8; see

also doc. 38-2, pp. 6–7 ("She called Mr. Ziegler [sic] to file a grievance and Mr. Ziegler [sic] told

her she could file one if she wanted with no other assistance.").)

    Jones "immediately" moved Plaintiff to another work area where she was not near either

Vescelus or Barthelmess for the rest of the workday.  (Doc. 26-1, pp. 25–26, 32.)  At the end of

the same day, however, as the TMS employees were boarding a truck that would take them to their

personal vehicles in a nearby parking lot, Vescelus grabbed onto Plaintiff's chest.  (Doc. 26-1, pp.

26–27.)  Plaintiff reported this to Jones the next day.  (Id. at p. 28.)  That day, Jones conducted an

investigation, and the following day he fired Vescelus.  (Doc. 26-3, pp. 17–19.)  Plaintiff did not

experience any problems at the worksite after this.  (Doc. 26-1, p. 29.)

### III.    TMS Discharges Plaintiff

    When Plaintiff's job with TMS was nearing its end, she asked Jones if she could continue

to work for him on TMS's next project.  (Id. at p. 34.)  According to Plaintiff, Jones told her that

he would use her for his next job and that he planned "to hang on to [her] for a little while."  (Id.

at pp. 34–35.)  At this time, TMS had another construction project lined up, but Jones later learned that it would require fewer workers than he initially estimated, forcing him to lay off some individuals.  (Doc. 26-3, p. 29.)  TMS dismissed Plaintiff during this layoff.  (Id. at p. 30.)  After the layoff, all the remaining workers for the next job were men.  (Doc. 26-5, pp. 9–10.)

When the number of workers needed for a project is limited, Jones operates under a rule where he lays off all travelers before laying off any members of Local 188.  (Doc. 26-3, p. 30.) Jones testified that he applied this rule in the aforedescribed situation, and he thus discharged Plaintiff in light of her traveler status.  (Id.)  In his own deposition, foreman Gracen testified that Plaintiff was dismissed because of "[l]ack of work."  (Doc. 26-5, p. 8.)  He stated that Plaintiff was "[n]ot necessarily" fired because she was a traveler, and he explained that the next job was going to be "strenuous," requiring some "roughnecks" to "tear stuff down and [do] demo work," and he did not think Plaintiff was the best fit.  (Id.)  While Gracen worked with Jones to help decide who to layoff, (id. at p. 8), Jones made the ultimate call to dismiss Plaintiff, (doc. 26-3, p. 30).

## IV.   Procedural History

Plaintiff filed a charge with the Equal Employment Opportunity Commission, (doc. 38-3), and obtained a right to sue letter, (doc. 38-4).  Plaintiff then filed her Complaint initiating this suit on January 17, 2019.  (Doc. 1.)  The Complaint alleges the Defendants violated Title VII by discriminating against Plaintiff on the basis of gender through both disparate treatment and sexual harassment and by retaliating against her for engaging in actions protected by the statute.  (Id. at pp. 5–6.)  She also seeks attorney's fees and punitive damages.  (Id. at p. 6.)  Both TMS and Local 188 filed Motions for Summary Judgment.  (Docs. 22, 25.)  Plaintiff filed a Response challenging TMS and Local 188's Motions, (doc. 38), and Local 188 filed a Reply, (doc. 40).

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)). However, "facts must be viewed in the light most favorable to the non-moving party only

if there is a 'genuine' dispute as to those facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  <u>Id.</u> (citation and emphasis omitted).

## DISCUSSION

Plaintiff claims that the Defendants violated Title VII by creating a hostile work environment through sexual harassment, discriminatorily discharging her due to her gender, and retaliating against her for complaining about sexual harassment.  (Doc. 1, p. 1.)  Both Defendants argue that Plaintiff cannot establish the prima facie elements for any of these claims.  (Doc. 22-1, pp. 6, 14; doc. 25-1, pp. 10, 18, 20.)   In addition, they argue that Plaintiff's discriminatory discharge claim and her retaliation claim fail because TMS had a legitimate, nondiscriminatory reason for dismissing her.[4]  (Doc. 22-1, p. 15; doc. 25-1, pp. 15, 19.)  For the following reasons the Court **DENIES** TMS's Motion for Summary Judgment as to Plaintiff's Title VII sexual harassment hostile work environment claim and her claim for attorney's fees.  However, the Court **GRANTS** TMS's Motion for Summary Judgment on Plaintiff's remaining claims and **GRANTS** Local 188's Motion for Summary Judgment in its entirety.

---

[4]  Local 188 also asserts that Plaintiff's claims against it fail because Local 188 never received Plaintiff's EEOC charge, and the EEOC did not investigate Local 188.  (Doc. 25-1, pp. 9–10.)  The Eleventh Circuit has advised against ruling on Title VII claims based on procedural technicalities.  <u>See</u> <u>Gregory v. Ga. Dept. of Human Res.</u>, 355 F.3d 1277, 1280 (11th Cir. 2004) ("Courts are . . . 'extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII].'") (quoting <u>Sanchez v. Standard Brands, Inc.</u>, 431 F.2d 455, 460–61 (5th Cir. 1970)).  Since the Court grants Local 188 summary judgment on substantive grounds, it declines to address this issue.

## I.      Sexual Harassment Hostile Work Environment

Plaintiff's Complaint asserts that both TMS and Local 188 violated Title VII by exposing her to a hostile work environment created by sexual harassment.  (Doc. 1, pp. 1, 5.)  The Court will address Plaintiff's allegations against each Defendant in turn.

### A.      Plaintiff's Claim against TMS

Under Title VII, it is unlawful for an employer to discriminate "with respect to [an employee's] compensation, terms, conditions, or privileges of employment" on the basis of her gender.  42 U.S.C. § 2000e-2(a)(1).  Although sexual harassment is not explicitly mentioned in Title VII, it is well established that sexual harassment can constitute discrimination under the statute.  See Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999) ("[T]his Court [has] long . . . recognized that '[t]he phrase "terms, conditions, or privileges of employment" evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment.'") (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  However, sexual harassment only amounts to a Title VII violation "when the harassment alters the terms or conditions of employment."  Id. at 1245.

Sexual harassment meets this threshold when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Hyde v. K.B. Home, Inc., 355 F. App'x 266, 271 (11th Cir. 2009) (quoting Harris, 510 U.S. at 21).  To make this showing, a plaintiff must demonstrate:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently

severe or pervasive to alter the terms and conditions of employment and create a
discriminatorily abusive working environment; and (5) a basis for holding the
employer liable.

Mendoza, 195 F.3d at 1245.  The record is clear (and Defendants do not dispute) that Plaintiff is a

woman and that Vescelus sent her sexually explicit messages and touched her, satisfying the first

three elements.  (Doc. 26-1, pp. 17, 26, 31.)  TMS argues, however, that it is entitled to summary

judgment because Plaintiff cannot show that the harassment was sufficiently severe or pervasive

nor can she show a basis for holding TMS liable.  (Doc. 22-1, p. 6.)

### (1)    Severity or Pervasiveness of Harassment

The  fourth  element  of  a  sexual  harassment  hostile  workplace  claim—severity  or

pervasiveness of the harassment—is comprised of both an objective and a subjective component.

See Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1276 (11th Cir. 2002) ("[T]his behavior

must result in both an environment 'that a reasonable person would find hostile or abusive' and an

environment that the victim 'subjectively perceive[s] . . . to be abusive.'") (quoting Harris, 510

U.S. at 21).  Here, Plaintiff easily meets the subjective prong in light of her testimony that she was

offended by both Vescelus's Facebook messages and his touching her buttocks and chest.  (Doc.

26-1, pp. 17, 23, 26.)

In determining whether the objective prong is met, the United States Court of Appeals for

the Eleventh Circuit has found the following factors to be relevant: "(1) the frequency of the

conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or

humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes

with the employee's job performance."  Mendoza, 195 F.3d at 1276 (citing Allen v. Tyson Foods,

Inc., 121 F.3d 642, 647 (11th Cir. 1997)).  A court should evaluate the complained-of conduct "in

context, not as isolated acts, . . . under the totality of the circumstances . . . ."  Id. (citation omitted);

see also Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81–82 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.").

Here, the first factor—frequency—tips in the Plaintiff's favor.  There is no "magic number" of events that create a hostile work environment.  Miller, 277 F.3d at 1276 (citation omitted).  Indeed, "[a]n egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment." Livingston v. Marion Bank & Tr. Co., 30 F. Supp. 3d 1285, 1309 (N.D. Ala. 2014) (quoting Lauderdale v. Texas Dep't of Criminal Justice, Inst. Div., 512 F.3d 157, 163 (5th Cir. 2007)).  Here, the evidence shows that Vescelus inappropriately touched Plaintiff on two occasions—once on her buttocks and once on her chest.  (Doc. 26-1, pp. 23, 26.)  These incidents occurred within the same two-week period where Vescelus also sent Plaintiff a Facebook message requesting sexual intercourse and mouthed "I love you" at her multiple times.[5]  (Id. at pp. 17, 23.)  Thus, the Court finds that Plaintiff has provided sufficient evidence to demonstrate that the harassing conduct occurred with sufficient frequency.     See, e.g., Spivey v. Akstein, No.

---

[5] Plaintiff's Response Brief argues that the Court should additionally consider Barthelmess's actions in the hostile work environment analysis.  (Doc. 38-2, p. 6.)  The record shows that Barthelmess yelled and tried to intimidate Plaintiff because they were arguing about whether a piece of welding equipment was functioning properly.  (Doc. 26-1, pp. 24–25.)  Nothing from the record indicates that this conduct was sexual in nature or that it was based on Plaintiff's gender.  Thus, the Court will not consider it.  See Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 809 (11th Cir. 2010) ("In a case like this, where both gender-specific and general, indiscriminate vulgarity allegedly pervaded the workplace, we reaffirm the bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII."); Williams v. United Launch All., LLC, 286 F. Supp. 3d 1293, 1302 (N.D. Ala. 2018) ("As an initial matter, evidence of non-sexual, non-gender-based harassment cannot support a plaintiff's claim of sexual harassment."); see also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67–68 (2006) ("Title VII, we have said, does not set forth a general civility code for the American workplace.").

104CV1003WSDCCH, 2005 WL 3592065, at *14 (N.D. Ga. 2005) (employee touching Plaintiff's breast along with less severe conduct sufficient to survive summary judgment).

Additionally, Plaintiff offers enough evidence for a reasonable jury to conclude that the behavior of Vescelus was severe and humiliating, in satisfaction of the second and third factors courts use in determining whether the harassment was objectively severe or pervasive. Several district courts within the Eleventh Circuit have found that evidence of groping and unwelcomed touching of the kind described by Plaintiff suffice to make out a sexual harassment hostile work environment claim. See, e.g., Smith v. Auburn Univ., 201 F. Supp. 2d 1216, 1225 (M.D. Ala. 2002) (conduct that included rubbing hand across plaintiff's breast was sufficient); Dinkins v. Charoen Pokphand USA, Inc., 133 F. Supp. 2d 1237, 1250 (M.D. Ala. 2001) (evidence that a supervisor touched plaintiff's buttocks and breast multiple times was adequate to survive summary judgment). Moreover, with regard to humiliation, Plaintiff testified that some co-workers were present when Vescelus grabbed her breast, and that other co-workers and superiors laughed when she showed them the sexually explicit messages he sent to her.

The final factor is whether the conduct unreasonably interfered with Plaintiff's job performance. A plaintiff does not have to show that harassment was "so extreme that it produces tangible effects on job performance in order [for her claim] to be actionable," making the threshold for satisfying this factor relatively low. Miller, 277 F.3d at 1277 (citing Harris, 510 U.S. at 22). If a plaintiff establishes "the frequency, severity, and humiliating nature of the conduct [then her] failure to establish convincingly how [the harasser's] conduct interfered with [her] duties is not fatal to [her] hostile environment claim, given the totality of the circumstances." Id. Here, even though the evidence indicates that Plaintiff was able to perform her job, the evidence also shows that she had to repeatedly speak to supervisors about Vescelus's conduct and that she did not feel

comfortable working near him, which a jury could reasonably find made it harder for her to do her job, in satisfaction of the final factor.  See Harris, 510 U.S. at  25 (Ginsburg, J., concurring) ("It suffices to prove that a reasonable person subjected to the discriminatory conduct would find . . . that the harassment so altered working conditions as to make it more difficult to do the job.") (internal quotation omitted).

TMS points to the facts of the Mendoza case in an attempt to persuade the Court that the touching in this case was not sufficiently severe or pervasive.  (Doc. 22-1, pp. 7–8.)  In that case, the plaintiff provided evidence that her supervisor followed her around the workplace, made sniffing noises while looking at her groin, and once rubbed his hip against hers while also touching her shoulder.  Mendoza, 195 F.3d at 1242–43.  The Eleventh Circuit held that this conduct was insufficient to support the plaintiff's hostile work environment claim.  Id. at 1250.  The physical touching in the case at hand, however, is much more severe and sexual in nature than the shoulder and hip touching in Mendoza.  Additionally, Defendants' argument overlooks the fact that, here, Vescelus also made direct, profane and sexually explicit statements and requests to Plaintiff, while there was no such conduct at issue in Mendoza.

In light of all the foregoing, the Court finds that Plaintiff has presented adequate evidence that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment, satisfying the fourth element of a sexual harassment hostile workplace claim

### (2)   Basis for Holding TMS Liable

TMS also argues that Plaintiff is unable to establish the fifth and final element of her claim—a basis for holding the employer liable.  When the perpetrator of the harassment is a co-employee of the victim, rather than a supervisor, the employer is liable "if it 'knew or should have

13

known of the harassing conduct but failed to take prompt remedial action.'" <u>Baldwin v. Blue Cross/Blue Shield of Ala.</u>, 480 F.3d 1287, 1302 (11th Cir. 2007) (quoting <u>Miller</u>, 277 F.3d at 1278).  This can be shown through either actual or constructive notice.  <u>See</u> <u>Breda v. Wolf Camera & Video</u>, 222 F.3d 886, 889 (11th Cir. 2000).  "Actual notice is established by proof that management knew of the harassment."  <u>Watson v. Blue Circle, Inc.</u>, 324 F.3d 1252, 1259 (11th Cir. 2003).  "Constructive notice, on the other hand, is established when the harassment was so severe and pervasive that management reasonably should have known of it."  <u>Id.</u>

For purposes of notice, Plaintiff provides evidence that she showed Vescelus's Facebook messages to Jimmy Ulmer, James Burrows, Brian Gracen, and Marlan Garrison.  (Doc. 26-1, pp. 19–20.)  While the Eleventh Circuit has "held that merely showing a supervising manager a sexually suggestive note, received by an employee from a coworker, did not adequately appri[s]e the manager of [the sexual harassment problem] and therefore did not rise to the level of 'actual notice,'" <u>Miller</u>, 277 F.3d at 1278 (quoting <u>Coates v. Sundor Brands, Inc.</u>, 164 F.3d 1361, 1365 (11th Cir. 1999)), here the evidence shows that Plaintiff took additional steps to adequately apprise her superiors of the sexual harassment problem.  In addition to showing them the messages, Plaintiff also told Burrows and Ulmer to keep Vescelus away from her.  (Doc. 26-1, p. 20.)  Furthermore, when Gracen and Garrison asked her to move to a different crew a week later, she implored them not to put her in closer contact with Vescelus, showed them the messages and explained to them that "he has not been able to control himself . . . and it [would] not be good" if they did not continue to be separated.  .  (<u>Id.</u> at pp. 19, 20.)  Thus, Plaintiff did more than just show these individuals Vescelus's messages without any further context; she actively conveyed to them what Vescelus had done and voiced her concerns about working close to him.  This is enough to establish that TMS had actual knowledge of the sexual harassment when Plaintiff first showed the

14

messages to Burrows and Ulmer, and again when she had the conversation with Gracen and Garrison when they asked her to work near Vescelus.  See Henson v. City of Dundee, 682 F.2d 897, 905 (11th Cir. 1982) ("The employee can demonstrate that the employer knew of the harassment by showing that she complained to higher management of the harassment . . . .").

Since TMS had actual knowledge of the harassment, its liability turns on whether it took "prompt remedial action."  Miller, 277 F.3d at 1278.  A "remedial action must be reasonably likely to prevent the misconduct from recurring."  Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir. 1996) (internal quotations omitted).  The record is clear that TMS investigated and fired Vescelus after Plaintiff informed Jones that Vescelus inappropriately touched her twice. (Doc. 26-1, pp. 24–25; doc. 26-3, p. 17–19.)  As nothing in the record indicates that Vescelus harassed Plaintiff again after he was fired, it is clear that TMS *eventually* took effective action.

The remaining issue is whether TMS's actions were sufficiently prompt.  As the Court has already made clear, TMS first had actual knowledge of Vescelus's conduct a week or two before his termination when Plaintiff reported his Facebook messages to Burrows and Ulmer. (Doc. 26-1, p. 19)  While Burrows and Ulmer did continue having Plaintiff work in a different area from Vescelus, which by itself might have been enough to prevent liability, Gracen and Garrison then pressured Plaintiff to switch work areas and to work alongside Vescelus even though she specifically asked to not have to do so.  (Id. at pp. 19–20, 22.)  Shortly after Plaintiff was moved, Vescelus touched her buttocks and repeatedly mouthed the words "I love you" to her.  (Id. at pp. 20, 23, 26.)

The Eleventh Circuit examined a case with similar facts to these in Watson v. Blue Circle, Inc., 324 F.3d 1252 (11th Cir. 2003).  In that case, the plaintiff worked as a concrete truck driver and experienced sexual harassment while making a delivery.  Watson, 324 F.3d at 1255. The

plaintiff asked her supervisor "not to send her back to the construction site because a worker there grabbed [her] hand and told her that he wanted to eat her." Id. at 1262 (internal citation omitted). In response, her supervisor laughed at her complaint and continued to send her to the site. Id. Importantly, in that case the plaintiff was not harassed at that site again because the construction worker was not there, but the Eleventh Circuit still found the evidence sufficient to create a jury question concerning whether the defendant took prompt remedial action. Id.

Here, like the supervisor in Watson, Gracen and Garrison laughed at and ignored Plaintiff's request to not work alongside Vescelus. In terms of promptly remedying sexual harassment, pressuring an employee until she agrees to work near her harasser is just as ineffective as directly ordering an employee to return to the location of harassment. There is no evidence that anyone spoke with Vescelus about Plaintiff's complaint before sending Plaintiff back to work with him. In addition, Gracen and Garrison's conduct had worse consequences than those in Watson, as it resulted in Vescelus inappropriately touching Plaintiff and doing other things that made her uncomfortable. Thus, under Eleventh Circuit precedent, the Court cannot find that TMS, as a matter of law, undertook prompt remedial action upon obtaining actual knowledge of Vescelus's conduct towards Plaintiff.

For all of these reasons, the Court **DENIES** TMS's Motion for Summary Judgment as to Plaintiff's sexual harassment hostile workplace claim. (Doc. 22.)

## B.     Plaintiff's Claim Against Local 188

Local 188 also moves for summary judgment on Plaintiff's sexual harassment hostile work environment claim, arguing that it cannot be held liable under Title VII because it is not Plaintiff's employer and it did not instigate or support any of Vescelus's conduct. (Doc. 25-1, pp. 20–21.) In response, Plaintiff asserts Local 188 is liable because "Ziegler [sic] told her she could file [a

grievance] if she wanted" but did not assist her in doing so.  (Doc. 38-2, p. 7.)  The United States Court of Appeals for the Eighth Circuit considered similar arguments in <u>Thorn v. Amalgamated Transit Union</u>, 305 F.3d 826 (8th Cir. 2002).  The plaintiff in <u>Thorn</u> experienced sexual harassment at her workplace and complained to her local union.  <u>Id.</u> at 829. The president of the local union then encouraged union members to not cooperate with an investigation launched by plaintiff's employer.  <u>Id.</u>  In addition, union members became hostile towards her, and her union refused to help her in another unrelated dispute with her employer.  <u>Id.</u> at 829–30.  The plaintiff sued the union for sexual harassment, but the trial court granted summary judgment in favor of the union, and the Eighth Circuit affirmed.  <u>Id.</u> at 833.  The Eighth Circuit reasoned that a labor organization can only be held liable for workplace harassment "if it causes or attempts to cause the employer to discriminate, . . . purposefully acts or refuses to act in a manner which prevents or obstructs a reasonable accommodation by the employer, . . . [or] pursues a policy of rejecting disparate-treatment grievances meant to vindicate employee rights protected by Title VII."  <u>Id.</u> at 832 (internal citations and quotations omitted).  The Eight Circuit concluded that the plaintiff had failed to provide evidence that the union did any one of these things.  <u>Id.</u> at 833.

Here, Plaintiff provides no evidence that Local 188 did any such things either.  There is no evidence, for instance, that it caused Vescelus to send her the Facebook messages or to touch her, or that it did anything to cause the responses (or lack thereof) that Plaintiff received from various superiors at TMS when she complained about Vescelus's conduct.  Similarly, there is no evidence that the union was involved in the decision to move Plaintiff to an area that required her to work near Vescelus.  There is also no evidence that Local 188 did anything to prevent TMS from discipling or firing Vescelus or that it did anything else to obstruct TMS from resolving the problem.  The record shows only that Plaintiff asked Zeigler to file a grievance for her and that he

refused.  (Doc. 26-1, p. 31.)  However, nothing in the record indicates that Zeigler's action reflected a Local 188 policy.  It is also uncontroverted that Plaintiff could have filed a grievance at the union hall notwithstanding Zeigler's refusal to file one for her.  (Doc. 26-2, p. 8; doc 38-2, p. 7.)  In addition, Plaintiff had the option to register her grievance with the international union.  (Id.)  Finally, the record reflects that the day Plaintiff spoke to Zeigler about filing a grievance was also the day that TMS took corrective action against Vescelus.  (Doc. 26-1, p. 32.)  Thus, Zeigler's refusal to file a grievance on Plaintiff's behalf "did not amount to active participation in the alleged sexual harassment or active obstruction of a reasonable accommodation by the employer."  Thorn, 305 F.3d at 833.  Plaintiff has not presented the Court with any other grounds upon which Local 188 could be held liable for this claim.  Accordingly, the Court **GRANTS** Local 188's Motion for Summary Judgment as to Plaintiff's sexual harassment hostile workplace claim.[6]  (Doc. 25.)

## II.    Disparate Treatment Claim

Defendants also claim they are entitled to summary judgment on Plaintiff's disparate treatment claim, in which she alleges that she was terminated from employment with TMS because she is female.  (Doc. 25-1, p. 10; see also doc. 1, p. 5.)  Under Title VII, it is unlawful for an employer "to discharge any individual, . . . because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  "A plaintiff alleging a claim of disparate treatment must establish that the employer intended to discriminate against the protected group."  Armstrong v. Flowers Hosp., 33 F.3d 1308,

---

[6] In her deposition, Plaintiff also stated that Zeigler called her a "bitch" and a "whore" several years before she worked at TMS.  (Doc. 26-1, p. 6.)  To the extent that Plaintiff bases her hostile workplace claim against Local 188 on this event, it must fail.  Even assuming Local 188 could otherwise be held liable for such a claim, evidence of an isolated occurrence of vulgar and sexist language is not enough to establish a sexual harassment hostile work environment claim.  See, e.g., Corbett v. Beseler, 635 F. App'x 809, 816–17 (11th Cir. 2015) (per curiam) (co-workers calling plaintiff "bitch" and "stupid fucking bitch" did not create hostile work environment because the comments were "isolated and sporadic"); Colon v. Envtl. Tech., Inc., 184 F. Supp. 2d 1210, 1218–21 (M.D. Fla. 2001) (co-worker's use of Spanish word that roughly translates to "bitch" or "whore" was not severe and pervasive enough to enable hostile work environment claim to survive summary judgment).

1313 (11th Cir. 1994).  This can be done through either direct or circumstantial evidence.  See E.E.O.C. v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000).  "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption."  Id. (citations omitted).  Said differently, "direct evidence of discrimination is powerful evidence capable of making out a prima facie case essentially by itself."  Jones v. Bessemer Carraway Med. Ctr., 151 F.3d 1321, 1323 n.2 (11th Cir. 1998).

Here, the only evidence in the record that could even arguably serve as direct evidence of gender discrimination are Gracen's statements about needing "roughnecks" for the next job because it was going to be "strenuous."  (Doc. 26-5, p. 9.)  However, in order for this statement to serve as evidence that Plaintiff was dismissed because Gracen thought male welders were better for strenuous work, one must infer that "roughnecks" are exclusively male.  Because such an inference is needed, these statements do not meet the "rigorous standard" for direct evidence.  Damon v. Fleming Supermkts. of Fla., Inc., 196 F.3d 1354, 1359 (11th Cir. 1999); see also Gunn v. Target Corp., No. CV-03-VEH-0357-NE, 2006 WL 8436892, at *12 (N.D. Ala. Jan. 26, 2006) (supervisor's "comment that he did not believe Plaintiff was 'physically capable' of meeting [the company's] productivity standards" was not direct evidence of discrimination because it would require "an inferential leap and presumption"); contra Castle v. Sangamo Weston, Inc., 837 F.2d 1550 (11th Cir. 1988) (providing an example of direct evidence of age discrimination as a piece of paper reading "Fire Rollins—she is too old.")

"Absent direct evidence, a plaintiff may prove intentional discrimination through the familiar McDonnell Douglas [burden shifting] paradigm for circumstantial evidence claims."  Joe's Stone Crab, 220 F.3d at 1286; see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800 (1973).  Under McDonnell Douglas, a plaintiff bears the initial burden of establishing a prima facie

case of discrimination.  411 U.S. at 802.  Once the plaintiff makes this showing, a presumption of discrimination is created and the burden shifts to the defendant to articulate "some legitimate, nondiscriminatory reason" for its actions.  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981) (citation omitted).  Finally, should the defendant satisfy this burden, "the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that merges with the plaintiff's ultimate burden of persuading the factfinder that she has been the victim of intentional discrimination."  Lewis v. City of Union City, 918 F.3d 1213, 1221 (11th Cir. 2019) (en banc) (citation and internal quotation marks omitted).

To establish a prima facie case, a plaintiff must show: "(1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably."  Lewis v. City of Union City, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc) (citations omitted).

It is undisputed that Plaintiff is a woman, was dismissed by TMS, and was a qualified welder, in satisfaction of the first three requirements for a prima facie case.  (Doc. 26-1, p. 31; doc. 26-5, p. 8; doc. 26-3, p. 39.)  However, Defendants argue that Plaintiff cannot establish the fourth element because she cannot show that TMS treated any similarly situated employees outside of her protected class more favorably than her.  (Doc. 25-1, p. 14.)  The Eleventh Circuit has held that "a plaintiff proceeding under McDonnell Douglas must show that she and her comparators are similarly situated in all material respects."  Lewis, 918 F.3d at 1226 (internal quotation marks omitted).  Under this standard,

> a similarly situated comparator will have engaged in the same basic conduct (or misconduct) as the plaintiff; will have been subject to the same employment policy, guideline, or rule as the plaintiff; will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff; and will share the

> plaintiff's employment or disciplinary history.  In short, as its label indicates—"all material respects"—a valid comparison will not turn on formal labels, but rather on substantive likenesses. . . . [A] plaintiff and her comparators must be [so] sufficiently similar, in an objective sense, that they cannot reasonably be distinguished.

Id. at 1227 (internal citations and quotation marks omitted).

Here, Plaintiff provides evidence that the only remaining workers at TMS after the layoffs were men.  (Doc. 26-5, p. 9.)  However, she fails to provide any other information about these men to determine whether they were similarly situated to her in all material respects.  Without this information, these individuals cannot serve as suitable comparators.  See, e.g., Washington v. United Parcel Serv., Inc., 567 F. App'x 749, 752 (11th Cir. 2014) ("[Plaintiff] failed to provide job information for four more comparators, and thus they also cannot be considered to be similarly situated due to a lack of sufficient information.") (citing Morris v. Emory Clinic, Inc., 402 F.3d 1076, 1083 (11th Cir. 2005)); Stoudemire v. Opp Health & Rehab., LLC, No. 2:16-CV-756-SMD, 2019 WL 3558040, at *5 (M.D. Ala. Aug. 5, 2019) (plaintiff could not show that her proffered comparator was similarly situated because she failed to provide the comparator's employment or disciplinary history).  Thus, because Plaintiff cannot identify any suitable comparator, she cannot establish the fourth element of her prima facie case, and her claim fails.

Even if Plaintiff could establish a prima facie case of discrimination, Defendants are nonetheless entitled to summary judgment because Plaintiff cannot show Defendants' legitimate, nondiscriminatory reasons for Plaintiff's termination were merely pretext for discrimination.  See Lewis, 918 F.3d at 1221.  "An employer's burden to articulate a non-discriminatory reason for [an adverse employment action] is a burden of production, not of persuasion."  Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 769 (11th Cir. 2005).  This burden "involves no credibility

determination" and only requires the employer to state "a clear and reasonably specific non-discriminatory basis" for its actions.  Id. at 769–70.

Neither party disputes that Plaintiff was classified as a "traveler" and was not a member of Local 188 at the time she was working for TMS.  (Doc. 26-1, p. 14; doc. 26-3, p. 30.)  In his deposition, Jones explained that he laid off Plaintiff because he needed to make cuts in his workforce, and he operated under the rule that "travelers get laid off first," before members of the local union.  (Doc. 26-3, pp. 29–30.)  Defendants have thus met their "exceedingly light" burden to articulate a legitimate, non-discriminatory explanation by showing that Plaintiff was dismissed because she was a traveler.  See Vessels, 408 F.3d at 769; Smith v. Horner, 839 F.2d 1530, 1537 (11th Cir. 1988) (describing employer's burden at this stage as "exceedingly light"); see also Chapman v. AI Transp., 229 F.3d 1012, 1031 (11th Cir. 2000) (burden met where stated reason may motivate a reasonable employer).

At this point, the burden shifts back to Plaintiff to produce evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  Chapman, 229 F.3d at 1024.  "[T]his obligation [is one] that merges with the plaintiff's ultimate burden of persuading the factfinder that she has been the victim of intentional discrimination."  Lewis, 918 F.3d at 1221 (citation and internal quotation marks omitted).  "To show pretext, [an employee] must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'"  Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1265 (11th Cir. 2010) (citation omitted).  However, an employee is "not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer."

Chapman, 229 F.3d at 1030.  Rather, "an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."  Id.

Plaintiff has failed to carry that burden here.  To rebut Defendants' stated reason for her dismissal, Plaintiff points to Gracen's statements that Plaintiff's traveler status was "[n]ot necessarily" the reason she was laid off and she again cites Gracen's statements about needing "roughnecks" for "strenuous work."  (See doc. 26-5, p. 9.)  Plaintiff argues that these statements show that her gender was the real reason that Defendants dismissed her.  (Doc. 38-2, p. 9.)  While Gracen was involved in the layoff process in general, (doc. 26-5, p. 8), it is undisputed that Jones "made the call" to terminate Plaintiff, (see doc. 26-3, p. 30).  Nothing in the record indicates that Gracen spoke to Jones about his preference for "roughnecks," or that Jones's decision to dismiss Plaintiff was impacted by Gracen's preference.  Thus, Gracen's statements alone cannot be used to prove that Jones's stated reason for letting Plaintiff go was pretextual.  See, e.g., Chambers v. Walt Disney World Co., 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001) ("At a minimum, to be deemed a decisionmaker, evidence must show that the employee made a recommendation concerning the challenged employment action, such as members of a hiring committee or promotion panel.") (citing Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1356 (11th Cir. 1999)).

For all the reasons set forth above, the Court **GRANTS** Defendants' Summary Judgment Motions as to Plaintiff's Title VII disparate treatment claim.[7]  (Docs. 22, 25.)

---

[7]  The record indicates that either Gracen or Jones learned about Plaintiff's traveler status from Zeigler. (Doc. 26-3, pp. 32–33.)  It also provides evidence that Zeigler disliked Plaintiff because they previously dated. (Doc. 26-1, pp. 39–40.)  "Personal animosity is not the equivalent of sex discrimination and is not proscribed by Title VII."  McCollum v. Bolger, 794 F.2d 602, 610 (11th Cir. 1986); see also Freeman v. Cont'l Tech. Servs., Inc., 710 F. Supp. 328, 331 (N.D. Ga. 1988) (summary judgment was appropriate because the "plaintiff was not terminated because she was a woman, but because of her sexual relationship with Dunlap and the consequences thereof").  Furthermore, Plaintiff acknowledges that TMS laid her off, and that Local 188 did not have that authority. (Doc. 26-1, p. 42.)  For these reasons, Zeigler's actions do not show that Local 188 caused Plaintiff's dismissal because of her gender.

### III.     Retaliation Claim

Plaintiff next asserts that Defendants violated Title VII by retaliating against her, specifically by firing her for complaining about sexual harassment.  (Doc. 1, p. 5.)  Under Title VII, it is unlawful for an employer to discriminate against an employee "because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e–3(a).  "A plaintiff establishes a prima facie case of retaliation by showing that: (1) she 'engaged in statutorily protected activity'; (2) she 'suffered a materially adverse action'; and (3) 'there was a causal connection between the protected activity and the adverse action.'"[8]  Chapter 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1258 (11th Cir. 2012) (quoting Howard v. Walgreen Co., 605 F.3d 1239, 1244 (11th Cir. 2010)).  Defendants argue that Plaintiff cannot establish the third element.  (Docs. 22-1, pp. 14–15; doc. 25-1, p. 19.)

Plaintiff easily meets the first two elements.  First, it is undisputed that Plaintiff complained about Vescelus's conduct towards her, (doc. 26-1, pp. 19, 25), in satisfaction of the first element.  See, e.g., Wheatfall v. Bd. of Regents of Univ. Sys. of Ga., 9 F. Supp. 3d 1342, 1353 (N.D. Ga. 2014) ("To be sure, reporting sex discrimination or a sexually hostile work environment constitutes protected activity.").  To make out the second element, Plaintiff must show that Defendants engaged in action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Crawford v. Carroll, 529 F.3d 961, 974 (11th Cir. 2008) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (U.S. 2006)).  Plaintiff's dismissal

---

[8] A plaintiff can also establish a retaliation claim through direct evidence.  See Merritt v. Dillard Paper Co., 120 F.3d 1181, 1189 (11th Cir. 1997).  Here, Defendants argue that there is no direct evidence of retaliation. (Doc. 22-1, pp. 10–12.)  Plaintiff's Response does not dispute this contention and only argues that she can establish a prima facie case of discrimination.  (Doc. 38-2, p. 7.)  Therefore, the Court will not address the issue of direct evidence any further.

from TMS satisfies this element.  See Jefferson v. Sewon Am., Inc., 891 F.3d 911, 924 (11th Cir. 2018) ("Termination is a materially adverse action.").  Thus, the Court will now turn to whether Plaintiff has satisfied the third element.

The Eleventh Circuit has "held that a plaintiff satisfies [the third element of a retaliation claim] if [she] provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action."  Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999). However, "when temporal proximity is used to establish a causal connection, the proximity must be 'very close.'"  Criswell v. Intellirisk Mgmt. Corp., Inc., 286 F. App'x. 660, 664 (11th Cir. 2008) (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)).  Here, the record shows that TMS terminated Plaintiff two or three weeks after she spoke to Jones about Vescelus.  (Doc. 26-1, pp. 25, 35.)  A reasonable jury could find that this is a short enough period of time to satisfy the causation element.  See Farley, 197 F.3d at 1337 (seven weeks sufficient to establish "a causal nexus for purposes of establishing a prima facie case").

Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendants to provide a legitimate, nondiscriminatory reason for their action.  See Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 n.6 (11th Cir. 2000) (citation omitted).  Defendants again assert that Plaintiff was dismissed because she was a traveler.  (Doc. 22-1, pp. 15–16; doc. 25-1, pp. 19–20.)  Like with her disparate treatment claim, Plaintiff is unable to rebut this proffered reason and show that is pretextual.  Specifically, Gracen's statement about needing "roughnecks" for the job is not helpful to Plaintiff here, as it in no way shows that retaliation against Plaintiff for complaining about Vescelus was the real reason for Defendants' actions.  See Brooks v. Cty. Comm'n of Jefferson Cty., 446 F.3d 1160, 1163 (11th 2006) ("A

reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'") (quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 515 (1993)).  For this reason, Plaintiff's Title VII retaliation claim fails.  The Court thus **GRANTS** Defendants' Motions for Summary Judgment as to this claim.  (Docs. 22, 25.)

## IV.    Attorney's Fees

Plaintiff requests attorney's fees and expenses of litigation for her discrimination claims. (Doc. 1, p. 6.)  Title VII provides that the district court, "in its discretion, may allow the prevailing party . . . a reasonable attorney's fee." <u>Myers v. Cent. Fla. Invs., Inc.</u>, 592 F.3d 1201, 1225 (11th Cir. 2010) (quotation marks omitted); <u>see</u> 42 U.S.C. § 2000e–5(k).  While none of Plaintiff's claims against Local 188 survive summary judgment, Plaintiff's Title VII hostile work environment claim against TMS will proceed.  Because of this, the Court will have the authority, after any trial, to award the prevailing party attorney's fees and related costs, if it finds such an award to be appropriate at that time.  Accordingly, the Court **GRANTS** Local 188's Motion for Summary Judgment on this claim but **DENIES** TMS's Motion for Summary Judgment to the extent that Plaintiff seeks attorney's fees based on her Title VII hostile workplace claim against it. (Docs. 22, 25.)

## V.    Punitive Damages

Plaintiff also seeks punitive damages.  (Doc. 1, p. 6.)  Under Title VII, punitive damages are limited "to cases in which the employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" <u>Kolstad v. Am. Dental Ass'n</u>, 527 U.S. 526, 529–30 (1999) (quoting 42 U.S.C. § 1981a(b)(1)).  Since none of Plaintiff's Title VII claims against Local 188 survive summary judgment, she cannot show that the union engaged in intentional discrimination against her.  In

addition, for Plaintiff to receive punitive damages for her remaining Title VII claim against TMS, she "must establish that 'the discriminating employee was high[] up the corporate hierarchy' or that 'higher management countenanced or approved his behavior.'"  Wilbur v. Corr. Servs. Corp., 393 F.3d 1192, 1205 (11th Cir. 2004) (quoting Miller, 393 F.3d at 1280).  It is not enough to just show that the employer had notice of the offensive conduct.  See Wilbur, 393 F.3d at 1205 ("Even if, as [plaintiff] asserts, [defendant] had notice of the alleged sex discrimination as of February 2002, when she complained to [defendant's] human resources department, [plaintiff] has offered nothing to establish that [defendant's] higher management 'countenanced or approved' the offending behavior of [plaintiff's] supervisors.")

The Court's review of the case law shows that punitive damages are appropriate in only the most egregious sexual harassment hostile workplace cases.  See, e.g., Henderson v. Simmons Foods, Inc., 217 F.3d 612, 619 (8th Cir. 2000) (punitive damages appropriate where the employer ignored most of plaintiff's complaint, moved the plaintiff closer to her harasser, refused to transfer plaintiff when the harassment continued, and threatened to fire plaintiff for her continual complaints); Timm v. Progressive Steel Treating, Inc., 137 F.3d 1008, 1009 (7th Cir. 1998) (upholding a punitive damages award where an employer had notice of prior instances of alleged sexual harassment by the harasser, took no action, and later justified its inaction by claiming that the employee failed to file a formal complaint, despite a company policy encouraging informal complaints).  Here, Plaintiff does provide evidence that Gracen and Garrison[9] knew about Vescelus's messages to her and still had her work near Vescelus.  (Doc. 26-1, p. 20.)  However, once Jones, a co-owner of TMS, learned that Vescelus touched Plaintiff, he immediately moved

---

[9] Additionally, Plaintiff has not provided evidence indicating that Gracen and Garrison, a foreman and a superintendent, respectively, would or should be considered "high[] up the corporate hierarchy" or members of "higher management" at TMS.  Wilbur, 393 F.3d at 1205 (quoting Miller, 393 F.3d at 1280).

her away from him.  (Id. at p. 25.)  Moreover, Jones fired Vescelus after receiving notice of his more serious conduct toward Plaintiff, indicating that the company's higher management did not condone or approve of his behavior.  (Id. at pp. 17–19.)  For this reason, Plaintiff has not shown that either of the Defendants engaged in conduct that would entitle her to punitive damages. Accordingly, the Court **GRANTS** Defendants' Motions for Summary Judgment as to this claim. (Docs. 22, 25.)

## CONCLUSION

Based on the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant The Mechanical Shop's Motion for Summary Judgment. (Doc. 22.)  The Court **DISMISSES** Plaintiff's Title VII disparate treatment claim, her Title VII retaliation claim, and her punitive damages claim against The Mechanical Shop.  However, Plaintiff's Title VII sexual harassment hostile workplace claim and her claim for attorney's fees against The Mechanical Shop both stand. In addition, the Court **GRANTS** Defendant Local Union 188 UA's Motion for Summary Judgment as to all claims against it.  (Doc. 25).  The Court **DIRECTS** the Clerk of Court to **TERMINATE** Local Union 188 UA as a party to this action.

**SO ORDERED**, this 14th day of July, 2020.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA